UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

COACTIV CAPITAL PARTNERS, INC.,

        Plaintiff,

  -against-                                    1:09-CV-01206 (LEK/RFT)

HUDSON CONVERTING, INC., d/b/a
W.S. HUDSON CONVERTING, INC.,
d/b/aW.S. HUDSON CONVERTING
MACHINERY;  WILLIAM HUDSON,

        Defendants.

## MEMORANDUM-DECISION AND ORDER

**I. INTRODUCTION**

Presently before the Court is Plaintiff's Motion for summary judgment against Defendants' Hudson Converting Inc., d/b/a W.S. Hudson Converting, Inc., d/b/a W.S. Hudson Converting Machinery ("Hudson Converting") and Mr. William Hudson ("Mr. Hudson") (collectively, "Defendants") (Dkt. No. 17).  Coactiv Capital Partners, Inc. ("Plaintiff") brings claims for fraud, aiding and abetting fraud, unjust enrichment, violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"), and conversion.  Plaintiff seeks a judgment in its favor and against Defendants for compensatory damages, punitive damages, interest, costs, and attorneys' fees.  For the reasons that follow, Plaintiff's Motion is granted.

**II. BACKGROUND**

In February 2008, IFC Credit Corporation ("IFC"), a non-party to this lawsuit, entered into Master Lease Agreement No. 801154 ("Lease Agreement") with Wildwood Industries, Inc. ("Wildwood"). Compl. (Dkt. No. 1), Ex. A. The Lease Agreement included a Double Folded Tri-Lock Inline Folding and Finishing System (Serial No. 2008-0096) and a Hepa Filter Production Line (Serial No. 2008-0097) (collectively, "machinery"). Compl. at 3. The Lease Agreement provided that IFC would order the machinery and send payment to a supplier that Wildwood would select. Compl, Ex. A at ¶ 3. The Lease Agreement also provided that Wildwood would make sixty (60) consecutive monthly lease payments of $43,929.00 each. Id. at ¶ 2.

In March 2008, IFC ordered the machinery from Hudson Converting, and Mr. Hudson "mailed Invoice No. 80096 in the amount of Nine Hundred Fifty Thousand Dollars ($950,000.00) to IFC for a Double Folded Tri-lock Inline Folding and Finishing System, purportedly bearing serial number 2008-0096" and "Invoice No. 80097 in the amount of Nine Hundred Sixty Thousand Dollars ($960,000.00) to IFC for a Hepa Filter Production Line, purportedly bearing serial number 2008-0097." Compl. at 4; Compl., Exs. B and C. In April 2008, IFC sold and assigned its interest in the lease pursuant to the terms of the Lease Agreement to Plaintiff's predecessor, which changed its corporate structure and name in August 2008 to "CoActive Capital Partners, Inc." Compl., Exs. D, E, and F. Shortly thereafter, IFC and Wildwood concluded "an Assignment of Payments agreement whereby IFC notified Wildwood that IFC had assigned to Plaintiff CoActiv its rights to lease payments from Wildwood under the Lease Agreement." Compl at 5; Ex. G.

In April 2008, Wildwood issued a Certificate of Acceptance that purported to acknowledge receipt of the machinery from Hudson Converting. Compl., Ex. H. Plaintiff, which had now been assigned IFC's rights and responsibilities in the Lease Agreement, sent $1,910,000.00 to Hudson

Converting as payment for the machinery.  Compl., Ex. I.  On that same day, Defendants wired $500,000 to Wildwood.  Compl., Ex. J.  After Defendants had received several more payments from other entities who were the victims of this scheme, Defendants wired Wildwood additional payments for $700,000.00 (on April 11), $800,000.00 (on April 14), $850,000.00 (on April 16), $800,000.00 (April 23), $1,000,000 (on April 28), and $500,000 (on April 30).  Compl., Ex. K.

Wildwood stopped sending its required monthly payments to Plaintiff in November 2008, and on March 5, 2009, an involuntary Chapter 11 petition was filed against Wildwood in the U.S. Bankruptcy Court for the Central District of Illinois.  Compl. at 6.  By March 5, 2009, Wildwood owed Plaintiff  $2,537,522.50.  This bankruptcy proceeding revealed that no machinery with the serial numbers 80096 or 80097 could be located.  Compl. at 7.  It was also revealed that Wildwood had submitted UCC filings for $130,000,000.00 for Wildwood equipment, despite the fact that the purchase price of this equipment was approximately $20,0000.  Compl. at 6.

In March 2010, an action was filed in the United States District Court for the Central District of Illinois (United States of America v. William S. Hudson, Criminal No. 10-10043), in which Mr. Hudson was charged with conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 1956.  Plaintiff's Motion, Ex. G.  Shortly thereafter, Mr. Hudson agreed to have the case transferred and disposed of in the Northern District of New York, and communicated his intention to plead guilty to the charges pending against him in Illinois.  Plaintiff's Motion, Ex. H.

On April 20 2010, in United States of America v. William S. Hudson, No. 1:10-CR-00163, which had been filed in the United States District Court for the Northern District of New York, Judge Thomas J. McAvoy held a Rule 20 Arraignment and Plea hearing, in which Mr. Hudson plead guilty to the charges that were brought against him in Illinois.  Plaintiff's Motion, Ex. C.  In

this proceeding, Mr. Hudson stipulated to the following:

> Number one. Wildwood Industries Inc., hereafter "Wildwood", was a company located in Bloomington, Illinois that, among other things, manufactured lawn, leaf, and vacuum bags.
>
> Two. The defendant, William S. Hudson, was President of W.S. Hudson Converting located in Queensbury, New York. Among other things, Hudson Converting produced manufacturing machinery used by Wildwood.
>
> Three. On or about March 5, 2009, creditors filed an involuntary bankruptcy petition as to Wildwood. Two months later, Wildwood's assets were sold for approximately $2 million.
>
> Four. Beginning in or about 2000 and continuing to in or about April 2009, at Bloomington, in the Central District of Illinois and elsewhere, William S. Hudson, defendant herein, knowingly combined, conspired, confederated and agreed with others known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:
>
> To knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce which involved the proceeds of a specified unlawful activity, that is mail fraud, in violation of Title 18, United States Code, Section 1341, wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(I)(B)(i).
>
> Five. The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:
>
> A. It was a part of the conspiracy that Hudson generated false invoices on behalf of Hudson Converting for machinery that was

used by Wildwood to obtain lease funding. The machinery was not actually purchased from Hudson Converting, but instead was already owned by Wildwood. In truth and fact, Hudson Converting did not build or ship any machinery to Wildwood at the times material hereto.

B. It was further a part of the conspiracy that Wildwood provided the false invoices to brokers who presented the invoices, along with Wildwood's reviewed financials and tax returns, to financial institutions and private lenders, hereinafter collectively referred to as lenders, in order to obtain lease funding for the non-existent equipment. In truth and fact, the reviewed financials provided to lenders were based on false and fraudulent information, including the representation that Wildwood was a very profitable company.

C. It was further a part of the conspiracy that after the lender paid Hudson Converting for the non-existent machinery, Hudson kept a portion of the funds and forwarded the balance of the funds to Wildwood's account through a series of interstate wire transfers from New York to Illinois.

D. It was further a part of the conspiracy that, in order to deceive lenders who sought to inspect their collateral, false serial numbers were created and affixed to machinery already owned by Wildwood. On occasion, the machinery was freshly painted so that the machinery would appear new.

E. It was further a part of the conspiracy that Wildwood used the funds fraudulently obtained from the lenders to make lease payments for previous fraudulently obtained machine leases which used the same existing machinery at Wildwood as collateral.

F. It was further a part of the conspiracy that Wildwood continued to deceive lenders by using new invoices from Hudson with different serial numbers for the same machines.

G. It was further a part of the conspiracy that more than $213 million fraudulently obtained from 85 lenders was laundered.

Id. at 11-14.

Also in April 2010, Mr. Hudson executed a Plea Agreement and Stipulation of Facts, which

stipulated and admitted to the following: "individuals associated with Wildwood devised a scheme to defraud federal insured financial institutions and private lenders;" "Wildwood obtained falsified invoices from the Defendant William Hudson purporting to represent the purchase of manufacturing machinery from W.S. Hudson Converting, Inc;" "the machinery was not actually purchased, but instead was already owned by Wildwood," "[d]uring the years under investigation, no machinery was purchased or shipped to Wildwood;" "[t]he false invoices were provided to several brokers . . . in order to obtain lease funding for the fictitious equipment;" "[t]he lenders mailed checks or wired money for the leases to the account of William Hudson," who "kept approximately ten percent of the money and wire transferred the remaining amount from New York to the Wildwood account in Bloomington, Illinois;" "[t]o give the appearance that the machinery was produced and delivered, an individual at Wildwood would sign delivery and acceptance certificates," "[w]hen financial institutions sent inspectors to view the machinery, they were shown a machine already owned by Wildwood" which sometimes contained false serial numbers; "some of the funds obtained from the false invoices were used to make lease payments for previous fraudulently obtained machine leases, which used the same existing machinery at Wildwood as collateral," "[l]enders continued to be deceived by the use of new invoices with different serial numbers for the same machines," "[d]uring the period of 2005-2008, Wildwood obtained over $213 million from approximately 85 lenders," and that "[a]pproximately $193 million remains unpaid on the principal balance. Plaintiff's Motion, Ex. I at ¶ 21. The Defendants have not reimbursed Plaintiff for the payment Plaintiff sent under the Lease Agreement for the Machinery. Plaintiff's Motion, Ex. D.

**III. DISCUSSION**

**A. Legal Standard for Summary Judgment Motions**

The standard for summary judgment is well-established. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A material fact is genuinely disputed only if, based on that fact, a reasonable jury could find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in a light most favorable to the nonmoving party. See City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 45 (2d Cir. 1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), but "must set forth specific facts showing that there is a genuine issue of fact for trial." First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 288 (1968). However, in the present action, Mr. Hudson, through his attorney, communicated to the Court that no response to the motion for summary judgment will be forthcoming. Letter Brief by William Hudson (Dkt. No. 18).

**B. Defendants Invocation of the Fifth Amendment**

On October 27, 2009, Plaintiff filed this civil action against the Defendant in the Northern District of New York (CoActiv Capital Partners, Inc. v. Hudson Converting, Inc., Case No. 1:09-CV-01206) for fraud, aiding and abetting fraud, unjust enrichment, RICO violation, and conversion. Plaintiff alleged that Defendants, along with non-party Wildwood, engaged in a fraudulent scheme whereby Defendants agreed to manufacture and deliver machinery to Wildwood, but instead issued fraudulent invoices to Plaintiff (or its predecessor in interest, IFC), accepted and retained payment from Plaintiff, and sent kickback payments to Wildwood in order to conceal the scheme. Defendants submitted an answer in which they admitted certain facts, but refused to answer virtually all of the questions with respect to Plaintiff's allegations of a fraudulent scheme by asserting their Fifth Amendment right against self-incrimination. Defendants' Answer (Dkt. No. 12).

In Defendants' Answer to the Complaint, Defendants invoke their Fifth Amendment right against self-incrimination with respect to virtually all of the allegations in the Plaintiff's Complaint that detail his allegedly fraudulent activities. Id. at ¶ 5. While a defendant is generally entitled to invoke its Fifth Amendment right against self-incrimination in a civil matter such as this case, if probative evidence is offered against a defendant, the Court may draw adverse inferences from a defendants' refusal to testify. Baxter v. Palmigiano, 425 U.S. 308, 318 (1975). Moreover, the invocation of the Fifth Amendment is only effective as to Mr. Hudson because the Fifth Amendment privilege does not apply to corporations. See U.S. v. White, 322 U.S. 694, 698 (1944).

**C. Fraud Claim**

With respect to Plaintiff's fraud claim, the Court finds that Plaintiff is entitled to summary judgment. The elements of fraud in New York law are: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff

reasonably relied upon the misrepresentation, and (3) the plaintiff suffered damage as a result of such reliance." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996).

    The Court finds that Defendants did make false material representations to Plaintiff's predecessor in interest, when they represented in March and April 2008 that they had delivered the machinery to non-party Wildwood Industries, Inc. Specifically, the two invoices sent to IFC for the machinery bearing the serial numbers 2008-0096 and 2008-0097, and Defendants' acceptance and retention of the $1,910,000.00 payment made by Plaintiff in return both demonstrate that Defendants falsely represented to Plaintiff that the non-existence machinery was being manufactured and delivered as per the terms of the Lease Agreement. See Compl., Exs. B and C.

    The Court finds that Defendants' misrepresentations were fraudulent. According to Mr. Hudson's Plea Agreement and Stipulation of Facts, "Wildwood obtained falsified invoices from the defendant William Hudson purporting to represent the purchase of manufacturing machinery from W.S. Hudson Converting, Inc. located in Queensbury, New York. In truth and in fact, the machinery was not actually purchased, but instead was already owned by Wildwood. During the years under investigation, no machinery was purchased or shipped to Wildwood." Plaintiff's Motion, Ex. I at ¶ 21. Moreover, according to Mr. Hudson's Rule 20 Arraignment and Plea, "Defendant Hudson pleading guilty to generating "false invoices on behalf of Hudson Converting for machinery that was used by Wildwood to obtain lease funding. The machinery was not actually purchased from Hudson Converting, but was already owned by Wildwood. In truth and in fact, Hudson Converting did not build or ship any machinery to Wildwood at the times material hereto." Plaintiff's Motion, Ex. C. at 12-13.

9

The Court also finds that these misrepresentations were material because they were the basis for IFC's payment to Defendants, as the false invoice induced Plaintiff to believe that the machinery was going to be manufactured and delivered to Wildwood. Declaration of Dennis Johnson, Ex. G at 6. Additionally, the Court also finds that Defendants intended to defraud and induce reliance by Plaintiff (or its predecessor in interest, IFC) based on the available evidence, which shows that Defendants had already conspired with Wildwood to send a "kickback" so that Wildwood would convince IFC that the machinery had in fact been delivered, and knew that IFC would send payment in reliance on the false invoices. Plaintiff's Motion, Ex. C at 11-12 ("Beginning in or about 2000 and continuing to in or about April 2009, at Bloomington, in the Central District of Illinois and elsewhere, William S. Hudson, defendant herein, knowingly combined, conspired, and confederated and agreed with others known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956.").

The Court finds that the reliance of Plaintiff (and IFC) on Defendants' false representations was reasonable, as Plaintiff had received seemingly legitimate invoices which indicated the machinery had in fact been produced. Compl., Exs. B and C. Finally, Plaintiff's loss of $1,910,000.00 was a direct, immediate, and proximate result of Defendant's false misrepresentations described above. This was the amount paid by Plaintiff to Defendants as a direct causal result of their material representations. Plaintiff's Motion, Ex. D. The Court therefore concludes that Plaintiff is entitled to summary judgment against Defendants regarding Plaintiff's fraud claim.

**D. Aiding and Abetting Fraud Claim**

The elements required for a plaintiff to establish liability for aiding and abetting fraud are "(1) the existence of fraud; (2) defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006) (quoting JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005)). As the Court concluded above, Defendants engaged in a fraud, in collaboration with Wildwood, perpetrated a fraud on Plaintiff by issuing false invoices and accepting and retaining payment in exchange for non-existent machinery. See supra, Section I(B).

Defendants knew of the existence of this fraud, as they conspired with Wildwood to accept and retain payments from Plaintiff for non-existent machinery, and had engaged in nearly identical frauds against other creditors for approximately eight years before they defrauded IFC and Plaintiff. Plaintiff's Motion, Ex. C at 11-12. Finally, the Court concludes that Defendants provided substantial assistance to Wildwood to advance the fraud's commission by issuing false invoices and sending kickback funds to Wildwood after receiving payment from Plaintiff. Plaintiff's Motion, Ex. I at 21. Defendants fabricated the invoices for the equipment which Plaintiff believed it was leasing to Wildwood. See Plaintiff's Motion, Ex. I; Plaintiff's Motion, Ex. C at 12-13 (pleading guilty to generating "generated false invoices on behalf of Hudson Converting for machinery that was used by Wildwood to obtain lease funding. The machinery was not actually purchased from Hudson Converting, but was already owned by Wildwood. In truth and fact, Hudson Converting did not build or ship any machinery to Wildwood at the times material hereto."); Compl. Exs. B and C (Invoice Nos. 80096 and 80097). The Court finds, therefore, that Plaintiff is entitled to summary judgment against Defendants with respect to the aiding and abetting claim.

**E. Unjust Enrichment Claim**

11

New York Law requires that, to prevail on an unjust enrichment claim, a plaintiff must demonstrate "(1) that the defendant benefitted, (2) at the plaintiffs expense, and (3) that equity and good conscience require restitution.'" Nordwind v. Rowland, 584 F.3d 420, 434 (2d Cir. 2009) (quoting Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc., 448 F.2d 573, 586 (2d Cir. 2006)).  Defendants benefitted from their actions at Plaintiff's expense when they received the payment for $1,910.000.00 directly from Plaintiff (or IFC) and retained approximately 10 percent of it.  Plaintiff's Motion, Ex. D at 5 and Ex. I at 21.  Finally, good conscience requires restitution given that Plaintiff engaged in a conspiracy to obtain these funds and failed to perform any meaningful service in exchange for Plaintiff's payment, instead accepting payment and issuing fake invoices for machinery which Defendants did not manufacture or delivered as previously agreed.  Plaintiff's Motion, Ex. I at 21; Plaintiff's Motion, Ex. C at 12-13.  The Court therefore concludes that Plaintiff is entitled to summary judgment on its unjust enrichment claim in the amount of funds received by Defendants from Plaintiff that they retained.

**F. RICO Claim**

The RICO Act allows "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter (18 U.S.C. § 1962)" to sue in an appropriate U.S. district court and to "recovery threefold the damages he sustains and the cost of the suit, including a reasonably attorney's fee."  18 U.S.C. § 1964(c).  Such a plaintiff "must plead (1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation."  Lerner, 459 F.3d at 283 (internal quotation omitted).

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). During the events in question, Mr. Hudson was the primary and/or sole officer and sold shareholder of Hudson Converting. Defendants' Answer, Plaintiff's Motion, Ex. C at 11, 14 (admitting that Mr. Hudson was President of W.S. Hudson Converting in Queensbury, New York). Mr. Hudson therefore meets the definition of being "employed by or associated with" Hudson Converting.

Hudson Converting, as a state-licensed corporation, constitutes an enterprise under § 1962. See 18 U.S.C. (an "enterprise" is "any individual, partnership, corporation, associations, or other legal entity"); Plaintiff's Motion, Ex. B (Defendants' answer admitting allegations in paragraph 4 of Plaintiff's Complaint that state "Defendant Hudson Converting is, upon information and belief, a corporation.") As a New York corporation that issued invoices for the delivery of the machinery and accepted payment in exchange for the machinery, Hudson Converting was engaged in, and its activities affected, interstate commerce.

Mr. Hudson has admitted that he issued fraudulent invoices to many creditors, including Plaintiff, which equipment that was neither manufactured or delivered. See Plaintiff's Motion, Ex. I at 21; see also Plaintiff's Motion, Ex. C at 12-13; Plaintiff's Complaint, Exs. B and C. Mr. Hudson's act of either mailing or faxing the Folding System Invoice and the Hepa Invoice to Plaintiff, its predecessor in interest, IFC, or Wildwood, constitutes two instances of racketeering activity under § 1962 because they constitute mail and/or wire fraud. 18 U.S.C. § 1961(1)(B) defines "racketeering activity," *inter alia*, as "any act which is indictable under any of the following provisions of title 18. United States Code: . . . section 1341" (18 U.S.C. § 1341) (relating to wire fraud); see also 18 U.S.C. § 1341. ("Whoever, having devised or intending to devise any scheme or

13

artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places any post office or authorized depository for mail matter, any matter of thing whatever to be send or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier . . . shall be fined under this title or imprisons not more than 20 years, or both"); 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."). Additionally, Mr. Hudson admitted that, after he received payment from creditors, including Plaintiff or its predecessor in interest, IFC, he transferred at least some of those funds to Wildwood via interstate wire transfer from Hudson Converting's New York account to Wildwood's Illinois account. Plaintiff's Motion, Ex. I at 21; see also Plaintiff's Motion, Ex. C at 13 ("It was further a part of the conspiracy that after the lender paid Hudson Converting for the non-existent machinery, Hudson kept a portion of the funds and forwarded the balance of the funds to Wildwood's account through a series of interstate wire transfers from New York to Illinois.").

      The Court finds that this conduct does constitute wire fraud, and therefore constitutes an additional instance of racketeering activity under § 1962. See 18 U.S.C. § 1961(1)(B); see also 18 U.S.C. § 1343. Mr. Hudson's activities constitute a pattern of racketeering activity, with two instances in which Mr. Hudson mailed or faxed fraudulent invoices occurring in or about 2008, and

an additional instance in which he wire transferred part of Plaintiff's payment as a kickback to Wildwood occurring in the weeks or months that followed and, in any event, within ten years prior to the first two instances. See 18 U.S.C. § 1961(5) (a "pattern of racketeering activity" requires "at least two acts of racketeering activity, one which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity"). The Court finds that Mr. Hudson committed a violation of § 1962(c) because he was employed by or associated with Hudson Converting, an enterprise that engaged in activities which affect interstate commerce, and Mr. Hudson engaged in a pattern of racketeering activity by means of repeated acts of mail and/or wire fraud in conducting business for Hudson Converting.

The Court finds that Plaintiff suffered harm in its business and property as a result of its payment to Defendants of $1,910,000.00 for machinery that was never manufactured or delivered to Wildwood. Moreover, the Court finds that this harm was directly caused by Mr. Hudson's violation of § 1962(c), because the false invoices sent by Mr. Hudson (via mail and/or wire fraud) and his acceptance and retention of Plaintiff's payment (via wire fraud) resulted in Plaintiff's loss of funds. See Plaintiff's Motion, Ex. D at ¶ 5. Plaintiff is therefore entitled to summary judgment on its RICO claims against Defendants.

**G. Conversion Claim**

Conversion is defined as "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Vigilant Ins. Co. of America v. Hous. Auth. of City of El Paso, Texas, 87 N.Y.2d 36, 43 (N.Y. 1995). "To establish conversion a plaintiff 'must demonstrate legal ownership or an immediate superior right of

possession to a specific identifiable thing' and that the defendant exercised an unauthorized dominion over that property, which can be specific money, to the exclusion of the plaintiff's rights." Meese v. Miller, 79 N.Y.S.2d 237, 242-43 (4th Dep't 1981) (internal citations omitted). "Money may be the subject of conversion if it is specifically identifiable and there is an obligation to return it or treat it in a particular matter." Hoffman v. Unterberg, 9A.D.3d 386, 388 (2d Dep't 2004).

As the Court concluded above, Plaintiff made a $1,910,000.00 payment to Defendants for non-existent machinery. Plaintiff's Motion, Ex. D at 5; Plaintiff's Complaint, Ex. I. Defendants accepted this payment and retained approximately 10 percent of it, transferring the rest as a kickback payment to Wildwood. Plaintiff's Motion, Ex. I at 21 ("The lenders mailed checks or wired the money for the leases to the account of William Hudson. Hudson kept approximately ten percent of the money and wire transferred the remaining amount from New York to the Wildwood account in Bloomington, Illinois."); Plaintiff's Motion, Ex. C at 13. Although Defendants retained only 10 percent of the funds, they also exercised dominion over the other 90 percent by accepting payment and directing the funds be sent to another entity as a kickback to further their fraudulent scheme. Plaintiff's Motion, Ex. I at 21.

The funds in this case are specific and identifiable, and Defendants had an obligation to return the funds to Plaintiff when they did not manufacture or deliver the machinery. Moreover, the failure of Defendants to manufacture or deliver the machinery also warrants the conclusion that the payment itself was unauthorized. The Court therefore finds that Plaintiff is entitled to summary judgment with respect to its claim for conversion against Defendants.

## IV. CONCLUSION

For the foregoing reasons, it is:

**ORDERED**, that Plaintiffs' Motion for summary judgment (Dkt. No. 17) is **GRANTED** with respect to its claims against Defendants for fraud, aiding and abetting fraud, conversion, unjust enrichment, and violations of the RICO Act; and it is further

**ORDERED**, that the plaintiff must submit a motion for damages within 30 days of the entry date of this order, and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.

DATED:	October 26, 2010
	Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge